Mr. Chief Justice Cartter
delivered the opinion of the court.
These cases, which were indictments for grand larceny, were submitted to the court together. The errors alleged are common to both of them, and the cases have been treated on the hearing as one case.
In the first place, while it is conceded that the indictment properly and technically charges the crime of grand larceny, wo are 'nevertheless asked to reverse the action of the court below in overruling a motion *to quash the indictment, upon the ground that a defendant cannot be called upon to answer to an indictment where it does not appear of record that it was found upon testimony duly sworn by the court and sent before the grand jury, or at least duly sanctioned by oath. If this be a good objection, then we are called upon to announce as the law, that the grand jury can only *376 act upon testimony sworn by the court and sent before them, or at least upon sworn testimony. We do not so understand the law. The grand jury is a body of longshistory and high repute, and with powers and duties limited and prescribed by the oath which each member is required by the law to take, an oath so explicit and compi’ehensive that the courts have ever and properly held it to be the interpreter of the powers of the tribunal to whom it is adminstered. That oath, as anciently administered to the foreman and repeated by his associates, was as follows :
“You shall diligently inquire, and true presentment make, of all articles, matters and things as shall be given you in charge, or otherwise come to your knowledge, touching this present service. The King’s counsel, your own, and your fellows, you shall well and truly keep secret. You shall present no man for hatred, malice or ill will; nor leave any unpresented for fear, favor or affection, or for any reward, hope or promise thereof; but in all your presentments, you shall present the truth, the whole truth and nothing but the truth, according to the best of your skill and knowledge, so help you God j” and so firmly had its form and substance become embedded in the jurisprudence of England, that it was thought it could not be altered except by act of Parliament,
It is administered to grand juries in this jurisdiction today, in this form, with only such changes as are rendered necessary by the nature of our government.
The grand jury, then, are to diligently inquire, and true presentment make, of all matters that shall be committed to them by the court, and in addition of all matters that shall otherwise come to their knowledge. The interpretation of this clause of the oath, from time immemorial, aiid in all jurisdictions, has been to make the grand jury the conservator of the public peace on their own observation and on their own motion. It is under this clause that they have been empowered to make inquiry of the health and proper treatment of the inmates of the prisons within their jurisdiction, to do which they are authorized to visit from time *377 to time these institutions, and to make personal observations of their sanitary and other conditions. So, too, of all charitable and other institutions supported at the public expense. And whenever within the jurisdiction from which they are chosen, any offence against the law comes within their own observation, or their own knowledge, they are authorized to present the offender, for the justice holding the criminal court cannot be presumed to know of every offence against the law. Since, therefore, the grand jury may indict upon their own observation and knowledge, there can be no necessity that there should be recited of record the.fact that proof duly sanctioned by oath was presented upon which the indictment was found. The law presumes that when the grand jury find their indictment, they find it upon the sanction of the necessary facts, and under the restrictions and within the purview of the oath they have taken, and when they have done that, they have done all that the law requires of them.
We do not wish to be understood as holding that thi grand jury in this District, under existing laws, are an ir-„ responsible body with unlimited powers, or that they may present in any case without competent legal evidence. We believe their action is to be confined to matters as to which (1) they may have knowledge from their own observation, or (2) which may be given them in charge by the court, or (3) submitted to them by the district attorney. Where their knowledge is not based upon their own observation, it can only be properly obtained by them from witnesses under the sanction of an oath.
Witnesses may be sworn to testify before the grand jury by the clerk or the court, and under the provisions of section 809 of the Revised Statutes of the United States, the foreman is authorized to administer oaths and affirmations to witnesses who appear before them, and no official record of the act is required to be kept.
We think that the motion to quash was properly overruled.
The question raised by the second exception is, whether *378 obtaining money or other property in the manner and by the means set forth in the record is sufficient to warrant a conviction of grand larceny. The defendants’ counsel insist that, however bad the offence actually committed may be, considered in its moral aspect, nevertheless it cannot be brought within the definition of the crime of grand larceny. And they argue, with much ability, from the facts in the record, that the only offence shown is the obtaining by these defendants of the money of the prosecuting witness through the medium of a game of chance. Now, it appears to us, that even if it be true that one of the means used by these defendants to effect their purpose was a game of chance, still that fact might not take the offence out of the category of larceny. It would largely depend upon what office the game of chanee performed, and whether it stood alone as the means by which the money was obtained. For if it was but a single factor in a series of facts operating to wrongfully deprive a man of the possession of his property, through fraud and fear, and with the intention of wrongfully converting it to the defendants’ use, then it is quite a different thing, and in our opinion comes as much within the definition of the crime of larceny as any one of the thousand contrivances rascality resorts to when it would feloniously take and carry away the personal property of another. But when we examine the record, we find that this so-called game of chance is nothing of the sort. That cannot be called a game of chance where the result is certain, and made certain by the working together of a series of facts and circumstances in which these four small playing cards form only an item. By a correlation of facts, one hitched to another, and another tacked to that, these defendants succeed in creating a chain of impositions that w’ould deceive a far wiser man than this prosecuting witness appears to have been, and they call it a game of chance, although it is in testimony that by no possibility could the victim have won. What is this game of monte, as it is called ? Counsel are at fault in confining it to the cards that were shuffled and picked out and played upon this man. The cards- were but a part of. the game.
*379 The modus operandi of this so-called game, as it appears by the testimony of Skiviugton and the other witnesses, as set forth in the record, and as fairly epitomized in the brief of the counsel for the Government, shows that, as usually practiced by the confederates, and as practiced by them in the cases at bar, it requires the agency of four persons working together in concert, by previous understanding and arrangement.
Two of these are known as “steerers,” one is known as the “ Kentucky drover,” and the other is known as the “ scare.”
The “ steerers ” frequent the Capitol, or some other public building or place to which strangers would naturally be attracted. One of the “ steerers ” accosts a stranger, pretending to be a stranger in the city himself, and states, in the course of conversation, that he is waiting for a friend from one of the Government departments, who has promised to meet him and conduct him to the various places of interest.
The time has now arrived for the appearance of “ steerer ” No. 2, who is in the vicinity watching, and he walks briskly up and salutes No. 1, and is introduced by No. 1 to the stranger.
No. 2 asks No. 1 whether he would like to see the grave of Mrs. Surratt, at the Arsenal; the stranger is invited to accompany them, and all three proceed to the Arsenal grounds.
At the Arsenal grounds the “ Kentucky drover ” appears ; he is attired in the garb of a countryman ; he is also looking for the grave of Mrs. Surratt, and makes inquiry of the party in relation thereto, and is also a stranger; tells them that he is from Kentucky; that he had brought a lot of cattle to Baltimore, where he had sold the same, and that some sharpers there had “ beat ” him out of a hundred dollars by a trick ; one of the “ steerers,” with apparent innocence, inquires what kind of a trick it was, and asks him to show it to them ; the accommodating drover produces four cards with picture faces, and proceeds in a clumsy way to do so ; *380 the “ steerer ” bets the “ drover ” ten dollars that he, the “ steerer,” can pick out the “ winning card,” and the “steerer ” wins with the greatest ease ; the “ drover ” will not bet with him again, but is willing to bet with the stranger; the “ steerers ” urge the stranger to bet with the “ drover,” and one of them, taking advantage of the apparent inattention of the “ drover,” marks the winning card by slightly bending one corner of it, so that no mistake can possibly be made in selecting it.
The stranger puts his $100 of genuine money and his watch in the hands of one of the “ steerers,” as stakeholder, and the “ drover ” puts in the same hands a large roll, apparently of money, but which really consists of a lot of green paper of no value, cut to the size of ordinary notes, upon the outsides of which are two genuine notes of small denominations. This contrivance is known in the vernacular of these gentry as the “ boodle.” The “ drover ” slyly turns down the bend made by his confederate, on the corner of the winning card, and bends or marks in a similar way the corner of one of the other cards ; then their positions are changed by passing them slowly over each other, and when this transposition has ceased, the stranger picks out the card with the bent corner, which is, of course, not the winning card, and before the astonished stranger has time to reflect upon the situation, the “ scare,” being monte-man No. 4, makes his appearance suddenly and puts the party, including the stranger, to flight, by announcing himself as an officer, and making a feint of putting the entire party under arrest for gambling. The confederates scatter, but subsequently meet and divide the profits of the transaction.
The term “ winning card,” applied to the so-called prize card, is a misnomer, for it appears by the testimony of Skivington, that even if the stranger had by any accident selected it, he would not have received the stakes or any part of them, nor have been permitted to obtain any advantage by it.
That is the history of the game, briefly told, from beginning to end, and it is what these men call the game of *381 “ monte.” A fraudulent arrangement gotten up for the purpose of feloniously taking the money of the victim and converting it to the use of the defendants. There is no chance about it. A game of chance is a game which gives to either party playing it an opportunity to win or lose. But that cannot be called a game of chance where one party presides over and controls the result of. the game.
Now, with these facts before us, we are asked to reverse the judgment, and declare that the learned justice below erred, because he told the jury that if they believed the testimony, this was not a game of chance, but larceny. It is left in doubt whether the court expressed it as an opinion or as a fact, but that is immaterial in this case, inasmuch as he would have have been thoroughly justified in asserting it as a fact, and telling the jury if they believed the testimony they must believe the inevitable result of that testimony. We do not think, therefore, that we ought to reverse the judgment upon this ground.
Another and the last objection involves the question whether the court may advance its opinion as to the facts proved by the testimony. We are of opinion that the court may in its discretion give its opinion upon the facts in evidence. It is a power, it is true, that ought to be cautiously-used, and never without a warning to the jury that°they are the triers of the facts in the case, and that the opinion of the coui’t in no wise concludes their judgment. While this is not the law in some of the States of the Union, the courts there confining themselves strictly to the law of the case, and leaving the facts without comment or opinion to the jury, yet the Supreme Court of the United States has expressly laid it down in Games v. Stiles, 14 Pet., 327, and Mitchell v. Harmony, 13 How., 131, that in the courts of the United States either course may be followed.
We are unable to find, therefore, that the court below exceeded its prerogative in this respect. With these views, the judgments in these cases must be affirmed.